THOMAS BEDNAR
DEAN M. CONWAY
*(counsel for service)*
SARRA CHO
CHRISTOPHER NEE
Email:  conwayd@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4412
Facsimile: (202) 772-9245

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>            Plaintiff,<br><br>      vs.<br><br>JOSEPH BAYLISS and RONALD ROACH,<br><br>            Defendants. | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.      Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of

business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  Both Defendants committed many of the acts set forth in this Complaint in this district.  For example, Bayliss sent commissioning certificates via email to Company S, which is located in this district, for distribution to investors.  Likewise, Roach sent Accountant's Compilation Reports via email to Company S.

## SUMMARY

4.     This case involves fraudulent securities offerings and a massive Ponzi scheme that raked in over $910 million in investor funds.  This Ponzi scheme was orchestrated by Individual 1 and Individual 2 through companies they controlled, and which they used to enrich themselves at investors' expense.  The Defendants in this action, Joseph Bayliss and Ronald Roach, each played an important role in this scheme to sell investment opportunities offered by certain solar energy companies in the business of making, leasing, and operating mobile solar generators ("Generators") -- investments that were touted as presenting gains in the form of tax benefits, guaranteed lease payments, and the resulting profits from the operation of the Generators.  In reality, thousands of the purportedly profitable Generators were never even manufactured, let alone put into use, and the vast majority of revenue to investors came from investor money, not from actual lease payments.  Bayliss advanced the scheme by providing bogus technical certificates of inspection for Generators he had never inspected -- and in many cases, for Generators that never existed.  Roach compiled financial statements, prepared by management, falsely reporting that the business had real and significant revenue from real leases, lent the imprimatur of his accounting firm to the bogus financials, and in some cases disseminated them directly to investors.  While investors were fleeced, Bayliss and

Roach each made millions off the scheme.

5.      In 2011, Individual 1 and Individual 2 began selling investment contracts through their privately-held alternative energy companies Company S and Company D (collectively with Individuals 1 and 2 "the Company").  Through December 2018, the Company raised around $910 million from purchasers of the investment contracts. The Company designed the investments to take advantage of tax credits that were available to certain alternative energy related projects.  To that end, investors purchased Generators from Company S and then immediately leased them to Company D.  Company D was then supposed to sub-lease the Generators to end-users.  The Company touted itself as a major player in its industry, with thousands of Generators in the field, lucrative contracts with big customers yielding a track record of major revenue, and extensive experience in making and maintaining the Generators and finding customers for them.

6.      That was all a sham.  The Company had manufactured and put into service far fewer Generators than it claimed, and made hardly any of its revenue from leasing Generators.  In fact, Company S did not actually manufacture about two-thirds of the Generators that it purportedly sold to investors.  Recent intensive efforts by investors to locate the Generators have identified just 5,858 of the approximately 17,600 Generators for which the Company entered into investor contracts.  Investors paid hundreds of millions of dollars for Generators that never existed.  And, legitimate lease income from actual end-users of the Generators represented a tiny fraction -- less than 5% -- of Company D's revenue.  The vast majority of Company D's revenue was comprised of investor funds transferred from Company S.  In reality, the vast majority of investor funds was not being used to manufacture, place into service, and maintain the thousands of Generators that the Company was using as the basis for investment contracts, but was instead being pilfered by Individuals 1 and 2 for their personal benefit, such as the purchase of luxury vehicles and real estate, and used to make lease payments and distributions to earlier investors.

7.      Defendant Bayliss played a key role in the scheme by falsely certifying the existence of non-existent Generators.  Bayliss claimed to be an independent engineer and signed a commissioning certificate for each Generator purportedly sold by Company S beginning in 2014, indicating that he had inspected the Generator and that it was in working order.  Investors relied on these certificates and were required to release payments to Company S upon receiving them.  In truth, Bayliss never laid eyes on the majority of the Generators for which he signed certificates.

8.      Defendant Roach likewise played an integral role in the scheme by concealing the lack of legitimate lease revenue from investors.  Roach is a certified public accountant who provided tax and accounting services to the Company.  Roach knowingly issued "Accountant's Compilation Reports," that accompanied unaudited financial statements for Company D that falsely stated that Company D generated hundreds of millions of dollars in "Rental Income."  In reality, the overwhelming majority of that "Revenue" consisted of transfers from Company S rather than lease payments from end-users of the Generators.  The reports Roach knowingly issued also accompanied financial statements for Company S which hid the significant cash transfers it made to Company D.

9.      As a result of the conduct alleged herein, Defendants have violated the antifraud provisions of the Securities Act and the Exchange Act.  The SEC brings this action and seeks entry of permanent injunctions against Defendants as well as disgorgement of ill-gotten gains and prejudgment interest thereon and civil penalties.

## THE DEFENDANTS

10.      Joseph W. Bayliss is a resident of Martinez, California.  Bayliss is the owner of Bayliss Innovative Services, Inc. through which he is licensed as an electrical and general building contractor.

11.      Ronald J. Roach is a resident of Walnut Creek, California.  Roach is a certified public accountant and the owner of Ronald J. Roach Accountancy Corporation.  He also hold Series 6, 7, 63 and 65 securities licenses and is a

registered investment adviser and a registered representative.

## RELATED INDIVIDUALS AND ENTITIES

12.     Company S is a California corporation headquartered in Benicia, CA.  It was owned by Individual 1.  Company S is not registered with the SEC in any capacity.  It filed for bankruptcy protection in early 2019 and is currently in Chapter 7 proceedings.

13.     Company D is a California corporation headquartered in Benicia, CA.  It was owned by Individual 2.  Company D is not registered with the SEC in any capacity.  It filed for bankruptcy protection in early 2019 and is currently in Chapter 7 proceedings.

14.     Individual 1 was a resident of Martinez, CA during the relevant time period.  In addition to owning Company S, Individual 1was the President and a Director of Company S and the Vice President and a Director of Company D.

15.     Individual 2 was a resident of Martinez, CA during the relevant time period.  In addition to owning Company D, Individual 2 was the President, Secretary, Treasurer, and a Director of Company D and the Secretary, Treasurer and a Director of Company S.

## FACTUAL ALLEGATIONS

**A.     Background on the Company**

16.     Individuals 1 and 2 are the owners and principals of Company S and Company D.  To investors, the Company claimed that it "design[ed], manufacture[d] and lease[d] renewable energy products to serve the off-grid needs of a broad and diverse marketplace – while providing investors with access to the renewable energy asset class."

**B.     The Company Offerings**

      **(1)     The Solicitation of Investors**

17.     Since at least 2011 and continuing to December 2018, the Company offered securities to investors.  The securities took the form of two types of

investment contracts: (1) Investment Fund Contracts and (2) Sale-Leaseback Contracts.  Under both arrangements, the investors paid to purchase Generators from Company S, while simultaneously leasing them to Company D.  Company D would then arrange to sub-lease the Generators to end-users.  The investors expected to profit from the investments due to tax credits, depreciation on the Generators, and lease payments.  Investors thus played an entirely passive role:  the success of the venture, and thus the profits to investors and the Company, turned entirely on the efforts of the Company to make, maintain, market, and lease the Generators.

18.     Over the course of the offerings, the Company raised approximately $910 million in investor money.  These deals had face values of more than $2.7 billion because investors in the Investment Fund Contracts financed approximately 70 percent of the amount of their investments through promissory notes.

19.     The Company, directly and indirectly, solicited investors through brokers and salespeople using various methods, including email, conference calls and in-person meetings.  The Company offered and sold Investment Fund Contracts and Sale-Leaseback Investments through interstate commerce to investors across the United States.

20.     The Company marketed itself as having extensive experience and capabilities in the renewable energy field and in executing successful transactions for investors.  For example, pitch-books for investors, which were prepared by a broker working on behalf of the Company using information provided by the Company, emphasized that the Company had thousands of Generators deployed and manufacturing capabilities of 900 Generators per month.  They also highlighted that the Company had closed many prior investment funds with "headline" or "notable" investors, including funds with fair market values near or over $100 million, and that the "performance of each of the funds remains in good standing."  In addition, the materials claimed the Company had "customer relationships with leading companies in the telecommunications, entertainment and construction industries" and provided

case studies of the established leasing arrangements with many of those customers. Finally, certain of the pitch-books provided a "Summary of Investor Returns" with estimated internal rates of return ranging from 40 to as high as 50 percent.

### (2)   The Terms of the Investment Fund Contract Offerings

21.   Investment Fund Contract investors executed a standard package of agreements, including:  (i) a Limited Liability Company Agreement ("LLC Agreement"); (ii) a Solar Equipment Purchase Agreement ("Purchase Agreement"); (iii) a Secured Promissory Note ("Promissory Note"); and (iv) a Mobile Solar Equipment Lease ("Equipment Lease") (together the "Investment Fund Contracts"). The documents were executed at or around the same time, with Individual 1 signing the Purchase Agreements on behalf of Company S and Individual 2 typically signing the Equipment Leases on behalf of Company D.  While the Investment Fund Contracts for certain deals had minor variations in wording, they largely had the same substantive terms.

22.   Under the terms of the LLC Agreement, an investor became the "Investor Member" of the Investment Fund Limited Liability Company ("Investment Fund"), an entity created specifically for the purpose of the investment.  This Investment Fund then purchased Generators from Company S at a price of $150,000 per Generator under the Solar Equipment Purchase Agreement.  The Purchase Agreement specified the total number of Generators being purchased as well as the total purchase price.  An Exhibit to the Purchase Agreement contained a blank space for the Vehicle Identification Numbers ("VINs") for the Generators or stated that "VIN for each Generator to be Supplied at Delivery."  In exchange for the payment, Company S agreed to deliver the Generators by a certain date or dates and warranted "to Buyer that all Equipment shall be in good working order in conformity with the Specifications for a period" of five or ten years.

23.   The delivery dates for tranches of Generators specified in the Purchase Agreements were often scheduled in stages.  Likewise, the Purchase Agreements

dictated that payments would be due to Company S in stages according to a schedule in part dictated by capital contributions being made by the investor under the terms of the LLC Agreement.  Those capital contributions were contingent on the investor receiving confirmation that the Generators were "Placed in Service" as evidenced by an "IE [Independent Engineer] Certificate."

24.     Investors generally contributed about thirty percent of the purchase price in cash and financed the balance pursuant to a Promissory Note or Notes executed by the Investment Fund in favor of Company S.  The Promissory Note was an exhibit to the Purchase Agreement.  The Company told investors, and arranged for a tax opinion letter from a law firm confirming, that the Generators qualified for the Energy Credit under Internal Revenue Code § 48.  That provision allows for a thirty percent tax credit for certain energy-related investments.  Thus, investors expected to be able to take a tax credit for roughly the same amount as their cash contribution to the investment.

25.     Under the Investment Fund Contracts, the Generator business was left entirely to the Company.  At the time the Investment Funds executed the Purchase Agreement with Company S, the Investment Funds also executed the Mobile Solar Equipment Lease with Company D for at least the first batch of Generators being purchased.  Depending on the size of the transaction, as additional tranches of Generators were manufactured, additional Equipment Leases were executed.  Under the Equipment Leases, the Investment Funds leased their Generators to Company D for terms ranging up to 120 months.  The Equipment Leases provided that Company D shall use "the Solar Equipment in a careful and proper manner" and "shall comply with all laws, regulations and ordinances."  Moreover, the Equipment Leases stated that Company D shall be "solely responsible for the maintenance and repair of the Solar Equipment" and "shall ensure the Solar Equipment is operational and capable of producing solar energy at all times."  The Equipment Leases required Company D to "obtain, maintain and keep" insurance coverage on the Generators in the amount of

the replacement cost as well as "liability insurance." In addition, the Equipment Leases required Company D to "promptly pay when due, all license fees, registration fees, sales taxes, use and property taxes, assessments, charges and other taxes" imposed upon the Generators.

26.     The Equipment Leases further provided for a set amount of "Base Rent" to be paid to the Investment Fund in advance in monthly installments for the term of the lease as well as payment to the Investment Fund of "Additional Rent" or "Variable Rent" to the extent Company D received revenue from subleasing the Generators in excess of a certain amount. The amount of additional or variable rent due to the Investment Fund varied depending on the deal and the calculation was specified in the Equipment Lease.

27.     The Investment Fund Contracts were structured such that there was a flow of money between the Investment Funds and the Company, all of which was contingent on the Generators generating significant sub-lease revenue from legitimate end-users. Company D owed monthly lease payments to the Investment Funds purportedly to be paid with the sub-lease revenue it received from third-party customers. The Investment Funds would then use the lease payments they received from Company D under the terms of the Equipment Leases to make monthly payments due to Company S under the terms of the Promissory Notes. Investors expected several benefits under the arrangement, including the thirty percent energy tax credit and the ability to claim significant depreciation on the Generators. In addition, investors expected to receive yearly cash distributions from the Investment Funds. In general, the LLC Agreements stated that "Distributable Cash," defined as the amount of cash from lease revenue remaining after loan payments and operating expenses, would be paid out to investors on an annual basis. Based on financial projections for the Investment Funds that were provided to investors, investors expected to receive these cash distributions.

28.     From December 2011 through December 2018, the Company closed 34

Investment Fund Contracts, involving 13 investors, totaling about $2.57 billion in face value.  The investors made roughly $759 million in cash contributions to their Investment Fund Contracts.

### (3)    The Terms of the Sale-Leaseback Contract Offerings

29.    The Company began offering the second type of security, the Sale-Leaseback Contracts, since at least 2017.  Investors in the Sale-Leaseback Contracts typically executed several agreements including: (i) a Sale Agreement; (ii) an Equipment Lease Agreement; and (iii) a Schedule (collectively the "Sale-Leaseback Contracts").  Individual 1 typically signed the Sale Agreement on behalf of Company S, or in one instance on behalf of another affiliate of the Company, and Individual 2 typically signed the Lease Agreement and the Schedule on behalf of Company D. While the Sale-Leaseback Contracts for certain deals had minor variations in wording, they largely had the same substantive terms.

30.    The Sale-Leaseback Contracts differed from the Investment Fund Contracts in that investors purchased the Generators outright from Company S, or in one instance another affiliate of the Company, without executing a Promissory Note. Under the Sale Agreement, investors paid $150,000 for each Generator they purchased.  The Generators were identified by VIN in an exhibit attached to that Agreement.  In exchange for the purchase price, Company S agreed to convey to the investors "all right, title and interest in" the Generators.

31.    One Sale-Leaseback Contract transaction differed from the others in that the investor purchased used Generators and paid $82,500 for each.  As the Generators were used, they did not qualify for the tax credit.  However, the investment worked the same as the other Sale-Leaseback Contracts with the investor immediately leasing the Generators to Company D and being entirely reliant on Company D to maintain and sub-lease the Generators.

32.    Just as was done in the Investment Fund Contracts, under the Sale-Leaseback Contracts the investors immediately leased the Generators back to

Company D (or another affiliate of the Company) in return for monthly payments purportedly to be made from sub-lease payments.  Under the Lease Agreement, Company D committed to keeping the Generators "in good repair" and operating condition and to "maintain" insurance coverage on the Generators as well as "liability insurance."  The Lease Agreement also required Company D to pay, or reimburse the investor for, all taxes, fees, and assessments imposed on the Generators.

33.     Like the Investment Funds, most investors in the Sale-Leaseback Contracts received an "IE Certificate," or "IE Commissioning Report," for each new Generator that they purchased.

34.     The Schedule to the Lease Agreement set forth the term of the lease and a set lease payment due to the investors from Company D each month.  An attachment to the Schedule again identified the Generators by VIN.  In addition to the monthly lease payments, most Sale-Leaseback Contract investors expected to be able to take the 30 percent energy tax credit as well as depreciation on the Generators they purchased.  In fact, the Schedules in certain of the Sale-Leaseback Contracts specifically referenced the energy tax credit and depreciation and required Company D to use the Generators so as to remain eligible for those tax benefits.  Based on the combination of tax benefits and lease revenue, the Sale-Leaseback Contract investors expected to earn a positive return and profit from these transactions.

35.     From 2017 through 2018, the Company completed seven Sale-Leaseback Contracts, involving 4 investors, in transactions worth nearly $151 million.

### (4)     The Company's Offerings Are Securities

36.     The Company offered and sold the Investment Fund Contracts and Sale-Leaseback Contracts through interstate commerce to investors located in multiple states.

37.     The Company's Investment Fund Contracts and Sale-Leaseback Contracts are securities in the form of investment contracts.  They represented an

COMPLAINT                                                11

investment of money, in a common enterprise, with the expectation of profits to be derived from the efforts of a third party.  Investors provided money to the Company for investment purposes.  Because the terms of the Investment Fund Contracts and Sale-Leaseback Contracts tied the fortunes of the investors to those of the Company and its ability to manufacture the Generators and then sub-lease them at optimal rates, investors were investing in a common enterprise.  And, because the terms of the Investment Fund Contracts and Sale-Leaseback Contracts made investors entirely dependent on the Company to manufacture, operate and maintain their purported Generators, the Company's efforts were essential to the failure or success of the common enterprise.  Investors also had an expectation of profits from the tax benefits and payment stream to be generated from the enterprise.

**C.     Defendants Committed Deceptive Acts in Furtherance of the Fraud**

38.     Unbeknownst to investors, the Company never manufactured the majority of the Generators that it sold them.  And, most of the lease revenue paid to investors consisted of investor funds, rather than lease income from legitimate end-users of the Generators.  Bayliss and Roach each played a role in hiding these facts from investors and perpetuating the Company's fraud.

**(1)     Bayliss Certified Generators that Did Not Exist and Altered VINs**

39.     By design, investors never physically took possession of the Generators that they purchased because the Generators were leased to Company D upon purportedly being placed in service.  Pursuant to the terms of the Purchase Agreements and LLC Agreements, investors in the Investment Funds made payments to Company S for the Generators in installments after receiving proof that the Generators had been placed in service as evidenced by the delivery of the "IE Certificate."  The LLC Agreements defined "IE Certificate" as "a certificate to be issued by the Independent Engineer" with respect to the Generators "upon achievement of Placement in Service."  Beginning in 2014, the LLC Agreements

further stated that "'Independent Engineer' means Joseph Bayliss of Bayliss Innovative Services."  Most Sale-Leaseback Contract investors also received these IE Certificates from Bayliss for the new Generators they purchased.

40.    Individual 1 arranged for Bayliss and his firm to serve as the "Independent Engineer."  This arrangement deceived investors as Bayliss was neither independent nor an engineer.  Bayliss holds general contractor and electrical licenses from the State of California, but he was never a licensed engineer.  And, Bayliss has known Individuals 1 and 2 since high school.  In fact, the Company and Individual 1 hired Bayliss to perform various projects for the Company and other businesses owned by Individual 1.

41.    The Company purported to sell more than 17,600 Generators to investors from its inception.  Bayliss executed IE Certificates, titled "IE Commissioning Reports," for nearly all of the Investment Funds and Sale-Leaseback Contract investors that purchased Generators from 2014 through 2018.  Those Investment Funds and Sale-Leaseback Contract investors contracted to purchase more than 16,400 Generators.  In thousands of instances, Bayliss signed IE Commissioning Reports for Generators without inspecting them, and without any basis for making the representations in the IE Certificates.  This is because Company S only manufactured a fraction of the Generators it purported to sell to the investors.  Indeed, recent intensive efforts by investors to locate those Generators turned up only 5,013 Generators of the more than 16,400 Generators for which Bayliss provided IE Commissioning Reports.

42.    The IE Commissioning Reports described Bayliss as the "Independent Engineer and Commissioner" and his signature line contained the title "Technical Engineering Consultant," along with a license number, which was actually the number, or a slight variation of the number, of Bayliss's state license as a contractor. Each IE Commissioning Report identified a Generator by VIN and contained a checklist of tests that Bayliss allegedly completed in assessing the Generator with an

"x" under the "yes" box for each test identified.

43.    Bayliss also falsely attested that "I have taken the steps described during the commissioning of the above system and confirm that the system was installed in accordance with professional engineering practices and safety requirements; and that the system is ready and able to be used for the production of electricity."

44.    Of the over 16,400 Generators that Bayliss prepared IE Commissioning Reports for, more than 11,400 could not be located.  Given that Bayliss signed the IE Commissioning Reports for these non-existent Generators without having inspected them, all of his statements in those reports were false and deceptive, and made by Bayliss in furtherance of the fraud.

45.    Bayliss knew, or was reckless in not knowing, that Company S had not manufactured thousands of Generators for which he signed IE Commissioning Reports.  Bayliss also knew, or was reckless in not knowing, that the IE Commissioning Reports he signed were being sent to investors and were important to them.

46.    Bayliss also profited from his work for the Company, earning over $2.4 million between January 2013 and December 2018.  Over $1,020,000 of these payments were made to Bayliss directly by the Investment Funds or the Sale-Leaseback Contract investors, mostly for his work in issuing the IE Commissioning Reports.

47.    At times, Company S sold the same Generator to different Investment Funds or Sale-Leaseback Contract investors.  Investors were unaware that their supposed Generators were being resold, or that they were purchasing used Generators to which someone else had an ownership claim.  As part of these efforts, the Company had to remove the VIN stickers from the Generators because each one had a unique VIN.  After removing the old VIN sticker from a Generator, the Company would replace it with a new VIN sticker in an effort to make it appear that the Generator was new.  Bayliss helped the Company remove and replace VIN stickers.

Bayliss knew this was being done in an attempt to dupe investors into believing that the Generators were new.

### (2)   Roach Issued Deceptive Compilation Reports

48.    Lease revenue from end-users of the Generators was critical to the success of the investments because it was supposed to provide the funds that Company D needed to make lease payments to the Investment Funds and Sale-Leaseback Contract investors.  Although Company D purported to be earning millions each month in lease revenue from end-users of the Generators, bank records demonstrate that Company D generated minimal lease revenue from sub-leases to end-users.  In fact, the vast majority of funds flowing into Company D's bank accounts consisted of transfers of investor funds from Company S.

49.    For example, during the period of January 2013 through December 2018, a total of about $409,930,000 was deposited to Company D's bank accounts. Of that amount, approximately $383,347,000 -- or 93.5% -- consisted of transfers from Company S's bank accounts.  And, another $8,268,000 -- or 2.0% -- consisted of transfers from the bank accounts of different Investment Funds.  At most, $18,316,000 -- or 4.5% -- of the deposits to Company D's bank accounts during the time period represented sub-lease payments from end-users of the Generators.

50.    But, during this period, Company D paid about $347,800,000 to various Investment Funds and Sale-Leaseback Contract investors, most of which took the form of "lease payments" owed under the operative Equipment Lease Agreements. Accordingly, Company D's payments were not funded by legitimate sub-lease revenue, but instead by investor funds cycled through Company S.

51.    Roach played a key role in misleading investors about the actual amount of lease revenue generated from end-users of the Generators and the true source of the funds coming into Company D.  Prospective investors routinely requested financial statements from Company D and Company S before investing.  In response, the Company often provided investors with financial statements.  Roach issued

"Accountants' Compilation Reports" for Company D and Company S covering various periods between 2011 through July 2018.  Roach signed these reports on the letterhead of his firm, Ronald J. Roach Accountancy Corporation.  The financial statements accompanying Roach's compilation reports included a statement of income in each, which Roach knew contained false and misleading information.  The accountant who issues the compilation report accompanying the financial statement must make himself familiar with the company's business and processes, and must not issue a compilation report on financial statements that he knows to contain false information.

52.     At the time Roach was issuing these reports, he knew that Company D was generating minimal lease revenue from end-users of Generators.  Roach also knew that Company S infused Company D with cash each month in order to support the lease payments due to the Investment Funds and Sale-Leaseback Contract investors, with the cash coming mostly from investor funds.  In addition, he was aware that investors were led to believe that Company D generated sufficient lease revenue from end-users of the Generators to pay its own lease payment obligations to the Investment Funds and Sale-Leaseback Contract investors each month.

53.     In total, the financial income statements for Company D accompanying the compilation reports issued by Roach falsely stated that Company D generated hundreds of millions of dollars of revenues in "Rental Income."  In reality, the overwhelming majority of purported "Rental Income" consisted of intercompany transfers from Company S.  Company D needed the cash transfers from Company S in order to cover its lease payment obligations to the Investment Funds and Sale-Leaseback Contract investors because it was not generating sufficient "Rental Income" from end-users of the Generators in order to cover those obligations.  The income statements were intended to mislead investors and potential investors into believing that Company D made hundreds of millions of dollars in "Rental Income" from end-users of the Generators from 2011 through 2018.

54.     Similarly, the various compilation reports for Company S that Roach issued also accompanied financial statements that contained false information.  The cash infusions of hundreds of millions of dollars from Company S to Company D were hidden in the "Direct Costs" category of Company S's income statements.  In reality, these payments had nothing to do with the costs of manufacturing the Generators.  Roach knew this categorization was wrong and he knew that Company S categorized the payments in this manner to conceal from investors the fact that Company S funded Company D's "Rental Income."

55.     Roach knew that the false financial statements and the compilation reports that he issued thereon were being provided to investors, often at the investors' request.  In fact, Roach at times sent the financial statements and his accompanying reports directly to investors via email.  He never told investors that information contained in the financial statements was false or inaccurate.

56.     Roach profited from his work for the Company over the years, receiving about $2.9 million between January 2013 and December 2018.

## FIRST CLAIM FOR RELIEF

**Fraud in Connection With the Sale of Securities
Violations of Section 10(b) of the Exchange Act
and Rule 10b-5(b) Thereunder
(against Defendant Bayliss)**

57.     The SEC realleges and incorporates by reference paragraphs 1 through 56 above.

58.     Defendant Bayliss, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

59.     By engaging in the conduct described above, Defendant Bayliss,

violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer and Sale of Securities
### Violations of Section 17(a)(2) of the Securities Act
### (against Defendants Bayliss and Roach)

60.    The SEC realleges and incorporates by reference paragraphs 1 through 56 above.

61.    Defendants Bayliss and Roach, by engaging in the conduct described above, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, with scienter, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

62.    By engaging in the conduct described above, Defendants Bayliss and Roach, violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## THIRD CLAIM FOR RELIEF

### Fraud in Connection With the Sale of Securities
### Violations of Section 10(b) of the Exchange Act
### and Rules 10b-5(a) and (c) Thereunder
### (against Defendants Bayliss and Roach)

63.    The SEC realleges and incorporates by reference paragraphs 1 through 56 above.

64.    Defendants Bayliss and Roach, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the

facilities of a national securities exchange, with scienter:

      a.    employed devices, schemes, or artifices to defraud; or

      b.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

65.    By engaging in the conduct described above, Defendants Bayliss and Roach violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

## FOURTH CLAIM FOR RELIEF

### Fraud in the Offer and Sale of Securities
### Violations of Sections 17(a)(1) and (3) of the Securities Act
### (against Defendants Bayliss and Roach)

66.    The SEC realleges and incorporates by reference paragraphs 1 through 56 above.

67.    Defendants Bayliss and Roach, by engaging in the conduct described above, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

      a.    with scienter, employed devices, schemes, or artifices to defraud; or

      b.    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

68.    By engaging in the conduct described above, Defendants Bayliss and Roach violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and (3) of the Securities Act, 15 U.S.C. § 77q(a)(1) and (3).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

## I.

Issue judgments, in forms consistent with Fed. R. Civ. P. 65(d), permanently enjoining Defendants, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## II.

Upon motion of the Commission, order Defendants to disgorge all ill-gotten gains they received, together with prejudgment interest thereon.

## III.

Upon motion of the Commission, order Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## IV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

1

## V.

2    Grant such other and further relief as this Court may determine to be just and

3    necessary.

4

5    Dated:  October 22, 2019

6                                        /s/ Tom Bednar
                                         _____
7                                        Thomas Bednar
                                         Dean M. Conway
8                                        Sarra Cho
9                                        Christopher Nee
                                         Attorneys for Plaintiff
10                                       Securities and Exchange Commission

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28